## Hexamer, Appellant, *v.* Hexamer.

*Divorce—Cruel and barbarous treatment—Act of June 25, 1895,* P. L. 308.

1. A libel for divorce brought by a husband against his wife for cruel and barbarous treatment will be dismissed where the only grounds alleged were that the wife was not a good cook although she had alleged herself so to be; that she had been guilty of five acts of trivial violence to the libelant the last of which occurred about six years

before the libelant left her; and that she had refused during the period they cohabited, to have unrestrained sexual intercourse with him.

2. The cruel and barbarous treatment and the indignities to the person, rendering the condition of the husband intolerable or life burdensome, which are by the act of June 25, 1895, made a cause for divorce relate to the personal treatment of the husband by the wife. The pangs of jealousy caused by the conduct of the wife with other men may render the condition of the husband intolerable and his life burdensome, but for such a result produced by such a cause, the act does not confer upon the courts jurisdiction to decree a divorce.

Argued Oct. 19, 1909. Appeal, No. 146, Oct. T., 1909, by plaintiff, from decree of C. P. No. 5, Phila. Co., March T., 1909, No. 40, refusing divorce in case of Charles J. Hexamer v. Annie J. Hexamer. Before Rice, P. J., Henderson, Morrison, Orlady, Beaver and Porter, JJ. Affirmed.

Libel for divorce.

Martin, P. J., filed the following opinion:

The libel in this case alleges that respondent, by cruel and barbarous treatment and indignities to his person, has rendered the condition of libelant intolerable and his life burdensome. There was a further allegation that respondent had given herself up to adulterous practices and been guilty of adultery with divers persons, but the libel was amended, and these charges withdrawn.

It appears by the testimony taken before the master that libelant and respondent were married on January 7, 1891, and have a daughter nine years of age.

They resided together until November 11, 1908, when libelant refused to continue to live with respondent.

The libel was filed December 15, 1908. Respondent answered denying the charges.

The alleged acts of cruelty and the indignities described by libelant, were that on the wedding night and for two months thereafter, he was denied intercourse, respondent having a morbid fear of childbirth. For that reason he "used a preventitive" which was "disagreeable and nerve-racking" to

him.  Respondent informed him before marriage that she was an excellent cook.  He subsequently ascertained that she knew nothing about housekeeping or cooking.  A month after the marriage she prepared some fried calves' liver for supper that had the consistency of sole leather.  When libelant declined to eat, and said he could not digest it, she slapped his face and screeched "digest that."

Several weeks subsequently when libelant said to her, "If your mother is like you, I don't wonder your father goes out so much and gets boozed," she screamed, "You nasty beast, I will leave you," went to her room, where he followed, and as she was putting on her hat called him a "Dutch beast," endeavored to thrust the hat pin in him, and said, "That should be the end of you."  He got her by the wrist and she simmered down.

The first summer they were married, on a Sunday morning during a visit to his parents at Atlantic City, she refused to come to breakfast.  He asked her, "Are you in a better humor now?"  Without replying she flew at him and struck him twice in the face with her clenched fist.

In 1895 she complained that he was too fat, that she was ashamed to go out with him.  He took treatment, but in effecting a reduction of forty-five pounds impaired his digestion and contracted chronic diarrhea.  His physician advised a trip abroad "alone."  When he informed respondent she said, "Do you think I am going to let you go off alone and have fun, and stay here in slow Philadelphia?"  They went through Syria.  During the journey respondent fell violently in love with a dragoman, and was with him from morning until night, riding well in front of the party.  When ascending Mount Tabor libelant was detained by a monk pointing out historical places on the plain below.  Respondent and the dragoman had gone ahead, but on arrival at the meeting place, they were not there.  Libelant waited an hour, and fearful that they had been attacked by hyenas sent servants to search for them.  They were unsuccessful.  Later respondent appeared, with the dragoman leading the horses, "radiant, her hair in disorder."  Libelant said "This is out-

rageous; you know how sick I am, and how every little excitement makes me worse." She sneered and said before the whole party, "Oh, tommy rot." Libelant having been advised by a member of the party that it would be wise to take his wife back to her mother, and to keep an eye on her. She said when he told her, "Don't listen to that meddlesome old fool."

Distress caused libelant to have acute diarrhea. He was compelled to frequently leave his tent in the night at the risk of being attacked by wild beasts, or shot by guards. This afforded amusement to respondent, who remarked in the presence of others, "That will take the conceit out of you." When the dragoman left, she wept. Libelant said to her, "Poor foolish child." She thinking it sarcasm struck him in the face. She was in a frightful humor the next few days and treated libelant "like a dog," and applied opprobrious epithets to him, calling him "confounded Dutchman," "foolish jackass" and "blithering idiot."

In 1899 she became pregnant. Libelant endeavored to convince her it was the result of an accident. She said he was a "brute" to cause her to have a child. Three weeks before the birth she remarked that she did not want the "darn kid" and when it came she was going to put it in the third story because she was not going to be bothered with it. When the child was born she insisted that libelant-should move to the third floor; for over a year allowed no sexual intercourse, and insisted upon retiring to her room at half past seven in the evening. When the child was three years old, she being in a frightful humor one evening at the table, libelant said in order to exist and support her and the child he required one meal a day, and as he could not get it at home, he would go to a restaurant. He put on his coat and hat; when he got to the door of the vestibule she rushed after him and knocked his hat off his head, started to pound him in the face and tried to tear his coat off.

Libelant became acquainted with a leading German actor whom he introduced to respondent. She fell violently in love with him, and insisted on seeing him whenever he played

a new part.   One night while suffering from a sprained ankle she insisted upon libelant taking her to the theater, and after the play to the café of the Schiller Hotel.   There she met her "friends," among whom was the actor.   At his last appearance she insisted upon attending the performance, and after the theater going to the Schiller café.   Libelant was unable to get her away until two o'clock in the morning.   She was wild because the actor was not re-engaged, and blamed libelant.   A friend asked him if he was aware that his wife met the actor at the Schiller café almost every Saturday afternoon.   When he spoke to her she admitted it, and insisted that she always had a friend or two with her when there.

In the autumn of 1907, libelant engaged a tutor to deliver a course of lectures to the German Society on the German dramatists.   He introduced him to respondent and invited him to his house.   Respondent fell violently in love with him and he with her.   If libelant and his wife went to the theater the tutor would have the seat alongside of her and talk and whisper to her continuously.   If they went to an entertainment, he would be there at her side.   He waited outside the ladies' toilet for her.   In the theater she would leave her child, sending it to libelant's mother, and sit with the tutor.   The talk and scandal became so decided that libelant rebuked her repeatedly, and she would answer, "Don't be a jealous old fool."

In the early part of 1908, she told libelant that she had never loved him, but married to please her parents, that she would have nothing more to do with him, and that he should keep a mistress or go to a bad house.   She frequently taunted him by asking if he had been somewhere for the purpose of prostitution, and when he said "No," would say it was because he was too much of a coward, and afraid of catching some bad disease—would sneer at him, and say she supposed he wanted to be as pure as an angel.

In March of 1908 libelant was invited to be guest of honor at the Robert Emmett celebration and requested to bring respondent.   She would not go because she had promised the

tutor to hear him lecture. When libelant stated, "It seems that I have not even a wife to represent me before the people as such," she replied, "Go to grass," and attended the tutor's lecture alone.

On March 27, 1908, Professor Kruger lectured before the German Society. Libelant said to her, "As a special favor, won't you please, if you do not care to sit with me, at least sit with someone else than the tutor when we have the supper which will be given in honor of Professor Kruger after the lecture?" She sat between a friend of libelant and the German consul. The tutor, who sat at the table opposite, became frightfully jealous as she started cutting up with these two gentlemen, pushed his plate away, got up and left the room. She rushed after him. As she passed libelant's chair he caught her by the arm and whispered, "Go back to your place, don't disgrace us both before all the people," and held her until she came to her senses, when she returned to her place.

On April 12, 1908, libelant engaged Professor Goebel of Harvard University to deliver a lecture on Faust. Respondent and the tutor were furious that the latter had not been engaged to make the address. After the lecture libelant gave a luncheon in honor of the lecturer. Respondent refused to sit with libelant at the place of honor, between the lecturer and libelant, but sat at the side of the table with the tutor. She requested the libelant to allow the tutor to speak. When libelant called on the tutor he said, libelant, who was the presiding officer, was but a fly of a day, that the trapdoor would soon close over him, and that a man more capable than he would take his place. Respondent wildly applauded, clapping her hands, cheered and cried, "Go on; that is right, give it to him," in the presence of the people at the dinner.

Libelant wrote to the tutor, "I forbid any further intercourse with you." The tutor replied inclosing a letter written by respondent to him. Libelant then wrote to the tutor that his explanation was satisfactory.

The intimacy between the respondent and the tutor was

the subject of general scandal among friends and acquaintances.

On May 9, 1908, libelant desired to have a birthday party at his home, but respondent said she had promised the tutor to hear him lecture at the German Club, libelant abandoned the birthday celebration and accompanied her.

On May 14, 1908, libelant moved his family to Oak Lane. During the evening, in the course of conversation with respondent, he told her for God's sake to break off with this man, that now was her chance, they had moved to the country for the summer. She wept and said she could not. He said, "I wish to say this to you, and mind it well; if I catch that man in my house, I will leave you. I will no longer be held up to the public and my friends in ridicule. My friends are already beginning to cut me."

On May 27, 1908, libelant and respondent attended a gathering of the ladies of the German Society at Schutzen Park. Libelant was obliged to leave to go to town and directed respondent to go home with her daughter, which she promised to do, but instead, stayed quite late with her daughter at the park, and the tutor took them home, and sat on the porch for a long while. Libelant learned of this from the child, and when respondent was charged with it, she admitted it. Libelant then told her that he was going to leave her, and he went to the Lorraine Hotel. Some days afterward respondent came to his office and said if he would come back she would promise to behave herself, but if he did not, he would never see his little daughter again. He returned and learned from the daughter that the tutor had been at the house on the Sunday that he was at the Lorraine. Two days after returning home libelant and respondent visited a German man-of-war lying in the river, as the guests of the captain. The tutor was on board. She withdrew from libelant to talk with the tutor. The following Sunday when they visited the Young Mannerchor the tutor was there, and respondent again joined him.

On June 8, 1908, libelant and respondent went to a celebration of the German-American Alliance at Washington

Park. In the afternoon libelant attended a banquet on the man-of-war, and requested respondent to take the child home, which she promised to do shortly. After libelant left the tutor arrived and rode with respondent on the front seat of an automobile, and tickled her "all the way home." After other guests had left the tutor remained.

Libelant intending to take respondent to the theater asked her after she retired on the previous night whether she intended to meet the tutor at the theater. She said, "Yes, she supposed so." Libelant said, "That man will have to stop, I shall write him to-morrow never to come to my house again." Respondent got up in bed and hissed, "You are the meanest white man on earth." Libelant lost control of himself and shook her. Libelant wrote to the tutor and told him it would give rise to talk among the neighbors, and requested him not to call on his wife in his absence.

On June 13, libelant visited Providence for a few days. On his return he learned that the tutor had been at the house.

On June 21 he visited Schenectady, and stayed over Sunday. On returning he ascertained that the tutor had visited the house.

On September 8, libelant and respondent went to the German Theater. The tutor secured a seat alongside of her, and whispered to her during the evening.

On Tuesday, November 10, libelant being required to visit Chester, informed respondent that he would be home very late, in all probability stay at the hotel, and go to his office directly in the morning. He arrived in Philadelphia about ten o'clock in the evening, and returned home. As he entered the house respondent came out of the sitting room, and when he kissed her, repulsed him and said that the tutor was in there; that she had asked him to come, and that it was time there should be an explanation between him and libelant. The tutor asked libelant what he had against him, and why he did not wish him to come to his house, to which libelant replied, because he had stolen the affections of his wife and made her so crazy that he could not live with her; that he had left her and had only returned for the child's

sake. The tutor stated that he had received a letter from respondent in which she placed herself under his protection, stating that libelant had laid hands on her. When libelant asked her if she had done this, she said, "Yes, why not?" Libelant burst into tears and said, "This means divorce; now both of you get out, get out at once; take her with you." The tutor said, "For God's sake be reasonable; think of your child; give me your hand." The libelant said, "No, begone, get out, get out, or I will kill you," and said to respondent, "You let him in, show him out." At the door the tutor said, "Let me have your hand," and libelant said, "No, never, from what you have done to me," and he said, "At least say good-by to me," and the libelant said, "Good-by," and closed the door. In the room were eatables on the table, two empty champagne glasses, and an empty quart bottle of champagne, and the cushions of the broad sleeping couch were in a disorder.

Libelant did not say a word to respondent, but the next morning left the house, and has lived with his parents ever since, but supports respondent.

Other witnesses testified to conduct of similar character, exhibitions of ungovernable temper, wearing "low cut dresses when he told her he disliked them," smoking cigarettes at family dinners, remarks that she would not live an hour of her married life over, and preferred small men to large ones (her husband being large and the tutor small), sitting with her back to libelant; and saying to a casual acquaintance who asked if his daughter was his only child that she "will remain so."

It was testified that at some of the festivities of the German Society, when the tutor came with an orchid in his buttonhole, in a few minutes she had the flower and wore it.

The testimony is thus elaborately reviewed because it is the duty of the court to make a careful examination of the evidence in order to ascertain whether it does in very truth establish the statutory grounds for a divorce: Shoemaker v. Shoemaker, 25 Pa. Superior Ct. 183, 185.

By the terms of the Act of June 25, 1895, P. L. 308, it is made a cause for divorce "where a wife shall have, by cruel

and barbarous treatment or indignities to his person, rendered the condition of her husband intolerable or life burdensome."

In determining whether there was cruel and barbarous treatment within the meaning of the statute the whole conduct of the wife toward her husband during the period of the alleged ill treatment should be considered: Barnsdall v. Barnsdall, 171 Pa. 625, 632; and if by other means she makes her husband's life burdensome or intolerable, as by obstinate silence, laziness, or willful neglect of household duties, they do not fall within the meaning of the act: Harris's App., 2 W. N. C. 331.

The case is presented of a woman possessed of a frivolous disposition with a penchant for flirting, who fails to realize the dignity and becoming decorum demanded of a matron occupying the social position in which her husband had placed her; and who, by her levity, has occasioned him chagrin, mortification and sorrow. Whether or not a reference of the parties to the domestic forum for the adjustment of their differences, recommending to the aggressor the improvement of her manners, and to the aggrieved the remedy of decent resistance or prudent conciliation, Butler v. Butler, 1 Parsons, 329–345, is adequate in this case, it is plain by reference to the authorities, no matter how much the court may sympathize with libelant in his unhappy domestic relationship, that the acts complained of while proof of conduct unbecoming a wife do not support the charge of cruel and barbarous treatment or indignities to the person.

The acts of alleged cruelty were isolated occurrences happening years before the filing of the libel. They did not place libelant in bodily fear, or prevent cohabitation.

The acts assigned by libelant for withdrawing from respondent's society was the predilection shown by her for the tutor, permitting him to visit her and accepting his attentions in disregard of libelant's prohibition; thereby arousing libelant's jealousy and creating in his mind the belief that her conduct rendered him an object of ridicule and scorn among their acquaintances.

In McMahen v. McMahen, 186 Pa. 485, the Supreme Court adopted the definition in 1 Bishop on Marriage and Divorce taken from the leading case of Evans v. Evans, 1 Hagg. Con. 35: "Cruelty, therefore, is such conduct in one of the married parties as renders further cohabitation dangerous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm as materially to interfere with the discharge of marital duties;" and the acts or conduct of the wife toward her husband that will entitle the latter to a divorce, must be not only such as to render his condition intolerable and life burdensome, but such as amount to cruel and barbarous treatment. Both of these statutory elements must concur: Schulze v. Schulze, 33 Pa. Superior Ct. 325.

It was said in Olsen v. Olsen, 27 Pa. Superior Ct. 128, 132, "Courts ought never to sever the marriage contract, but where the application is made in sincerity and truth for the causes set forth and no other, and fully sustained by the testimony: Angier v. Angier, 63 Pa. 450. The marriage relation should never be dissolved without clear proof of imperious reasons: Richards v. Richards, 37 Pa. 225. Divorce ought never to be decreed without clear and satisfactory evidence of the wrong which the law treats as justifying cause for divorce."

It may be said of this case, as in Hahn v. Bealor, 132 Pa. 242, 256, "It exhibits a state of domestic infelicity, but it does not present a case of cruel and barbarous treatment by the wife of the husband, which rendered his condition intolerable and life burdensome."

That it was bad, shamelessly bad, must be conceded. That it was such as to call for the abhorrence of every right-minded man, appears plainly from the evidence. But it is not all bad conduct of a wife which entitles a husband to a divorce. Causes sufficient for that are such only as are defined in the acts of assembly. STRONG, J., in Gordon v. Gordon, 48 Pa. 226, 234–235.

It was said in Richards v. Richards, 37 Pa. 225, and reiterated in Middleton v. Middleton, 187 Pa. 612, "Never

ought divorces to be easily obtained, for marriage is the most sacred of human relations, and should never be dissolved without clear proof of imperious reasons:" Rochelle v. Rochelle, 28 Pa. C. C. Rep. 458, 460.

The libel is dismissed.

*Error assigned* was the decree of the court refusing the divorce.

*F. F. Brightly* and *John G. Johnson*, for appellant.—It is respectfully submitted that to establish cruelty under the statute, it is no longer necessary under the authorities to prove actual physical violence: Barnsdall v. Barnsdall, 171 Pa. 625; Schulze v. Schulze, 33 Pa. Superior Ct. 325; Russell v. Russell, 37 Pa. Superior Ct. 348; Trowbridge v. Carlin, 12 La. Ann. 882; Menzer v. Menzer, 83 Mich. 319 (47 N. W. Repr. 219).

No printed brief for appellee.

OPINION BY PORTER, J., March 3, 1910:

The plaintiff filed in the court below a libel praying for a divorce from the respondent, alleging that she, "by cruel and barbarous treatment and indignities to his person, hath rendered the condition of this libelant intolerable and his life burdensome." The libel as originally filed alleged, as a further ground for divorce, that the respondent had given herself up to adulterous practices and been guilty of adultery with divers persons in this commonwealth and elsewhere, but the libelant saw fit, by an amendment, to entirely eliminate this charge from the issue. The only question which the court below was called to pass upon, or to be considered upon this appeal, is, did the evidence produced establish that the respondent had by cruel and barbarous treatment and indignities to the person of her husband, the libelant, rendered his condition intolerable, and his life burdensome within the meaning of the Act of June 25, 1895, P. L. 308? The court below deemed the evidence insufficient and dismissed the libel; from which decree the libelant appeals.

The opinion of the court below, by Judge MARTIN, which will appear in the report of this case, so fully reviews the testimony and vindicates the conclusion at which he arrived as to render unnecessary an extended discussion of the questions presented. In determining whether there was cruel and barbarous treatment and indignities to the person of the libelant, within the meaning of the statute, which rendered the condition of the latter intolerable and his life burdensome, the whole conduct of the wife towards her husband during the period of the alleged treatment should be considered: Barnsdall v. Barnsdall, 171 Pa. 625; Fay v. Fay, 27 Pa. Superior Ct. 328. The parties were married on January 7, 1891, and dwelt together as man and wife until November 11, 1908, almost eighteen years. One child was born of this union, a daughter, on October 24, 1900. The husband testified to the conduct of the wife during the entire period of their cohabitation, and as to some of the matters covered by his testimony he was corroborated by the testimony of other witnesses. It has been argued here that the testimony established that the conduct of the wife during that entire period had constituted such cruel and barbarous treatment and indignities to the person of her husband as to entitle him to a divorce under the statute. The discontent of this libelant seems, from the testimony, to have had its origin in the discovery of the fact that his wife was not a good cook; that this cannot be considered in passing upon his right to a divorce, under the statute, is too clear for serious discussion. The statute was intended to afford a remedy to the husband for the intentional acts of the wife which could be reasonably held to involve cruel and barbarous treatment, or indignities to his person, resulting in rendering his condition intolerable. There is nothing in the statute which would warrant the courts in granting a divorce because the wife did not do what she was not able to do. The testimony disclosed five alleged acts of trivial violence offered by the wife to the husband, the last of which occurred about six years before the husband left his wife.

That physical violence offered by the respondent to the

plaintiff was not the cause for his leaving her six years later, in 1908, is clearly established by the testimony. During the intervening six years there was not, so far as the evidence discloses, either violence or anything that could be construed to be a threat of violence. Even had the libelant separated from his wife in 1902, immediately following the last act of physical violence, the evidence produced, as to five widely separated and trivial violent acts, during a period of eleven years, would not have warranted a court in granting a decree of divorce, under the provisions of the act of 1895. The testimony of the libelant to the effect that the respondent had refused, during the period they cohabited, to have unrestrained sexual intercourse with him, does not establish a case of barbarous and cruel treatment, which would justify the granting of a divorce: Magill v. Magill, 13 Pittsburg Legal Journal, 626; Eshbach v. Eshbach, 23 Pa. 343; Platt v. Platt, 38 Pa. Superior Ct. 551.

The testimony with regard to the incidents hereinbefore referred to includes all of that produced which referred directly to the treatment of this libelant by his wife; the remainder of the testimony referred not directly to the treatment of the libelant by the respondent, but had reference to the manner in which she treated other men. It has been suggested in the argument for the appellant that the latter withdrew from the libel the allegation of adultery on the part of his wife because of his regard for the future of his child, but, that if necessary, the circumstances disclosed by the evidence were sufficient to establish the graver charge. We cannot thus change the issue. The libelant cannot have a decree of divorce upon any ground other than that alleged in his libel. Courts ought never to sever the marriage contract, but where the application is made in sincerity and truth, for the cause in the libel set forth, and no other, and fully sustained by the testimony: Middleton v. Middleton, 187 Pa. 612; Olson v. Olson, 27 Pa. Superior Ct. 128. The cruel and barbarous treatment and indignities to the person, rendering the condition of the husband intolerable or life burdensome, which are by the act of June 25, 1895, made a cause for divorce, relate

to the treatment of the husband by his wife, and her conduct toward him personally. President Judge RICE, in his opinion in Fay v. Fay, 27 Pa. Superior Ct. 328, said: "Nevertheless, the acts or conduct of the wife towards her husband, that will entitle the latter to a divorce under the clause of the statute now being considered, must be not only such as render his condition intolerable or life burdensome, but such as amount to cruel and barbarous treatment. Both of these statutory elements must concur. If by other means, which do not constitute legal cruelty, his condition is rendered intolerable, this clause of the statute does not apply;" and to the same effect Schulze v. Schulze, 33 Pa. Superior Ct. 325. Causes sufficient for the granting of a decree of divorce are such only as are defined by the acts of assembly: Gordon v. Gordon, 48 Pa. 226; Angier v. Angier, 63 Pa. 450; Richards v. Richards, 37 Pa. 225. The burden was upon the libelant in this case to establish by evidence the facts which would entitle him to a divorce for the cause alleged in his libel. He was required to prove that his wife had been cruel to him, had offered indignities to his person, and this burden he could not discharge by proving that his wife had been too kind to other men. The testimony exhibits a state of domestic infelicity, but it does not present a case of cruel and barbarous treatment by the wife of the husband, or indignities to his person, which rendered his condition intolerable and life burdensome, within the meaning of the statute: Hahn v. Bealor, 132 Pa. 242. The testimony, it may be conceded, established that the conduct of the respondent with men other than her husband had been indiscreet and such as to arouse the suspicions, or even the jealousy, of the libelant. The pangs of jealousy may have rendered the condition of the husband intolerable and his life burdensome, but for such a result, produced by such a cause, the statutes do not confer upon the courts jurisdiction to decree a divorce.

The decree is affirmed and the appeal dismissed at cost of the appellant.