## Wentsler v. Wentsler.

*Judges—Retired judges—Assistance to court—Act of June 12, 1919— Divorce.*

1. A judge of the Common Pleas who has retired under the provisions of the Act of June 12, 1919, P. L. 461, is still a member of the court, and to him may be referred for advice and assistance a master's report in divorce, the recommendations of which are not approved by the court.

*Divorce—Indignities to the person—Evidence.*

2. In a divorce proceeding where indignities to the person are alleged as ground for divorce, it is for the court to determine whether words and acts, after they have been proven, constitute indignities.

3. A divorce will not be granted in such a case where the testimony consists merely of the opinion and conclusions of biased witnesses, and not what respondent said and did.

4. The fact that respondent, in the presence of guests in his home, and when he and his wife went anywhere, was accustomed to use vulgar and indecent language, and to entertain those present with objectionable stories, is not a ground for divorce because of indignities to the person where respondent's conduct was otherwise unobjectionable.

Libel for divorce. C. P. Fayette Co., Sept. T., 1925, No. 712.

*Sterling, Higbee & Matthews,* for libellant; no appearance for respondent.

MORROW, J., May 21, 1926.—The master's report in this case, together with a copy of the testimony taken before him, was submitted *c. a. v.* The master recommended that a decree be entered divorcing the libellant from the bonds of matrimony between her and the respondent. On reading the testimony, we felt that it did not warrant the entry of such a decree. We then requested an examination thereof by E. H. Reppert, retired judge, who is still a member of our Court of Common Pleas, under and by virtue of the provisions of section 2 of the Act of June 12, 1919, P. L. 461, he advising with and assisting in the work of said court as contemplated by said act. He has prepared an opinion in the case, which we accept and adopt. It is as follows:

While we regret to differ from the learned master to whom this case was referred, yet, after careful consideration of the testimony, we are unable to find that the respondent offered such indignities to the person of the libellant as to render her condition intolerable and life burdensome, and thereby force her to withdraw from his home and family, as set forth in her complaint.

The parties were married Sept. 6, 1914, and lived and cohabited together as husband and wife until Feb. 14, 1925, when she left the home of the respondent and went to her parents. No children were born to the union.

So far as appears, she was never subjected to physical violence, nor was it ever offered or threatened; there was no profanity, no drunkenness or other dissipation, no abusive acts, threats, insults, slights, aspersions, offensive epithets or accusations of any kind whatever reflecting upon the libellant. It seems that the respondent was industrious and steadily employed in a

Wentsler *v.* Wentsler.

responsible position by H. C. Frick Coke Company during the entire period the parties lived together, and no complaint is made that the home furnished, the manner in which it was maintained and the support provided the wife were not at least satisfactorily commensurate with the means of the husband. It is alleged in support of the averment upon which the application is based that the respondent did not spend his evenings at home; that visitors were unwelcome; that he would make week-end visits or excursions without inviting his wife to accompany him; but the main ground and substance of complaint is the allegation that in the presence of guests in his home and when he and his wife went anywhere he was accustomed to use vulgar and indecent language and to entertain those present with objectionable stories.

Three witnesses were sworn and their testimony is before us: the libellant, Miss Rose Moore, an intimate friend, and Mrs. Una Morris, a sister. The respondent did not appear. The hostility of these witnesses to the respondent, their bias and desire to create an impression unfavorable to him, are very manifest, as is also a tendency to magnify the matters and incidents to which they refer. The most of the testimony consists of the opinions and conclusions of the witnesses in regard to the conduct of the respondent, and not of what he said and did. It largely leaves the material allegations of the petition to mere guesswork: Carter *v.* Carter, 1 Kulp, 359. Such portions of the testimony are, of course, without value. It is for the court to determine whether words and acts, after they have been proven, constitute indignities. Bearing this in mind, the wife's account of the week-end visits of herself and husband to the latter's cousin in Greensburg, while an unpleasant experience, is of little weight; and if the husband on the first visit was so offensive in language and behavior, it seems remarkable that husband and wife should repeat the visit two weeks later, presumably by invitation, when it is alleged there was a similar exhibition.

And the same may be said of the testimony of the wife and her intimate friend, Miss Rose Moore, in regard to the visits of the latter. These visits covered practically the entire period of the married life of the parties, were of frequent occurrence, for a few hours, over night, or for the week-end, and for the last two years would average once a week. Miss Moore testifies that the respondent's use of vulgar language in her presence began on her first visit, and his conversation thereafter was continuously offensive, and that many times when she retired he would come into her bed-room and attempt to assist her to undress. The wife testifies to the same effect. If this witness, as a guest and friend of the wife, voluntarily subjected herself with increasing frequency to alleged offensive and insulting language and misbehavior on the part of the respondent for a period of ten or eleven years, without affront, resentment or such a sense of indignity as would lead to a discontinuance of her visits, we hardly think the language and misbehavior were sufficiently serious, under the circumstances, to render the wife's condition intolerable and her life burdensome.

The last visit of Miss Moore to the Wentsler home was the 7th and 8th of February preceding Saturday, Feb. 14, 1925, when the libellant left. The two had arranged to pass the week-end in Uniontown, but changed their plans. After spending the evening at a show in Connellsville, they went to Scottdale to Mrs. Wentsler's home. Both testify in substantially the same language that the respondent seemed surprised and put out at their unexpected coming, was ungracious, irritable and impatient and showed it by his words and conduct. Yet such displays are not uncommon and experience teaches that they are rarely one-sided and entirely unprovoked, and are not

Wentsler *v.* Wentsler.

to be taken too seriously. During dinner Sunday evening the libellant alleges "that he started to talk and I was never talked to in my life like that," and Miss Moore says that "then he started to talk to her, and I have never heard anything like it in my life, and he talked something dreadful to her." Statements such as these express merely the opinions and conclusions of the witnesses and are without probative value. Notwithstanding the unpleasantness which began almost immediately on her arrival Saturday night, Miss Moore remained until Monday morning. And while the wife testifies that, after his talk at the dinner table, her husband said, "if I didn't like it, just to pack my clothes and get out right now," and Miss Moore testifies to the same effect, yet the wife did not leave the home of the respondent until the following Saturday. No other unpleasant incidents are testified to as occurring in the meantime. Nor is it alleged that the relation of husband and wife or their ordinary every-day life was disturbed. And even in this incident both these witnesses testify to a display of affection by the husband which was repulsed by the wife. It hardly seems probable that the happenings referred to were the immediate cause of the separation. This appears to have been the only occasion when the words of the respondent, whatever they were, or his conduct were directed toward his wife.

The sprained-ankle incident took place in the presence of the libellant, her father and the husband of the lady concerned. Under such circumstances, we are inclined to the conclusion that her account of her husband's action is somewhat overstated. The resentful hostility of the sister, Mrs. Morris, was most apparent and greatly weakened the force of such small portion of her testimony as was competent. It might be observed, however, that with full knowledge, she not only visited the respondent's house herself, but permitted her young daughter to do the same. Men do not become foul-mouthed over night. If from the time of his marriage the respondent was accustomed to entertain his guests and the guests of others with *risqué* stories and vulgar allusions (and this is the substance of the complaint), it is difficult to believe that the libellant, who must have mingled socially with him and his friends more or less before marriage, was not aware of such practice. Much of the competent testimony could have been corroborated by disinterested witnesses. This was not done.

The indignities to the person that constitute ground for divorce relate to the treatment of the injured party by the other and the conduct of the offender toward the other personally. In the absence of personal violence, they must consist of unmerited reproach, groundless accusation, rudeness, contempt, studied and intentional neglect, open insult, abusive acts and language or threats, openly, systematically, habitually and continuously pursued to such an extent as to render the condition of the injured husband or wife intolerable and life burdensome: Richards *v.* Richards, 37 Pa. 225; Mason *v.* Mason, 131 Pa. 161; Hexamer *v.* Hexamer, 42 Pa. Superior Ct. 226; Brubaker *v.* Brubaker, 4 Dist. R. 185; Smith *v.* Smith, 44 Legal Intell. 472.

In the last cited case it is said: "The indignities must be to the person of the libellant and with the intent to injure and annoy her. . . . There must be such a course of conduct or continued treatment as renders the wife's condition intolerable and her life burdensome and such as endangers her life or health and renders cohabitation unsafe. If the acts complained of do not indicate a settled purpose by the husband to injure his wife and pursue a course of conduct for that purpose, the complaint is not established."

In Brubaker *v.* Brubaker, 4 Dist. R. 185 (1894), it is said by Judge McPherson that: "The 'person' meant by the statute is the individual personality

formed by the union of body and spirit, and indignities offered to either are necessarily offered to both. But some indignities must be borne; indeed, all must be borne until they render the condition of the sufferer intolerable and her life burdensome and thereby force her to withdraw from her husband's house and family. Obviously, however, mere withdrawal (which is easy to accomplish) is not satisfactory evidence that she has endured up to the requirement of the law; she must show, further, that her bodily or mental health was either impaired or endangered by the treatment to which she was subjected. . . . The burden of proof is upon the libellant; she is bound to show that her condition has been rendered intolerable and her life burdensome, and it is not unreasonable to require her to prove, as the most probable and most visible sign of that condition, that her health is either broken or is likely to break."

The only evidence in the case relating to the effect upon her health of the indignities complained of is that of the libellant herself, elicited by the sympathetic, helpful and suggestive cross-examination of the master, many of his questions, under the circumstances, being objectionable in form. Thus:

Q. You yourself are a woman of refinement? A. I am. Q. Now, Mrs. Wentsler, what effect did the dirty stories, the impolite talk, references to sex and the other matters spoken of by your husband to these different people, heard by you during your married life, have on your nerves, your sense of propriety and your health in general? A. It was just so embarrassing and nerve-wracking that I could hardly stand it. Well, I was just brought up so different in my own home that I just couldn't hardly stand it. I never was used to it and never used such talk myself. Q. What effect did it have, if any—I mean this course of conduct on the part of your husband—have on your nerves, your health and strength? A. It just made me almost a nervous wreck. Q. What do you mean when you say it made almost a nervous wreck of you? A. Well, when we went out any place or had company, I lived in dread as to what he would say next. Q. Did it cause you to worry? A. It certainly did. S. Did you lose any sleep over it? A. Lost nights and nights of sleep. Q. Did it cause you to worry? A. It did. Q. Did it have any effect on your health of body? A. Well, I can't say it just had anything to do with that, but I have been stronger since I came home than any time in my life. Q. Did it have anything to do with your peace of mind? A. It kept me nervous as to what he would say next. Q. State whether or not this conduct of his was continuous and uninterrupted during the years you lived with him? A. He kept it up all the time we were married. Q. State whether or not you endured this course of conduct as long as you could in safety as to your health, strength and peace of mind? A. I did. Q. When you couldn't endure it any longer, you finally left on Feb. 14, 1925, and you haven't been back to live with him since that time? A. I haven't.

In the absence of corroboration, easy to be had in case of impaired health, it is difficult to believe that her fear of what her husband might say when they were out or had company made her almost a nervous wreck, in view of her statement that it did not have any effect on her bodily health, and of her reply in her examination-in-chief to the question: "I will ask you, Mrs. Wentsler, whether you use vulgar and indecent language or ever did so?" A. "I never made a practice of it; I have told little jokes, but never made a practice of talking vulgar in front of people."

"Divorce should not be decreed without clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce, especially when the witnesses are likely to be biased and have not been subjected to cross-examination:" Edmond's Appeal, 57 Pa. 232. As above pointed out, the cross-examination of the libellant by the master was helpful rather than adverse and hostile.

"Courts ought never to sever the marriage contract, but where the application is made in sincerity and truth for the causes set forth, and no other,

and fully sustained by the testimony:" Angier v. Angier, 63 Pa. 450; Richards v. Richards, 37 Pa. 225.

"Bad temper alone is not ground for divorce, nor is mere drunkenness, or indolence, or thriftlessness, or jealousy:" Mason v. Mason, 131 Pa. 161; Hexamer v. Hexamer, 42 Pa. Superior Ct. 226. For the same reasons, we apprehend that neglect, the use of vulgar or profane language, or the indulgence of any other objectionable habit or practice, causing mortification, discomfort and unhappiness, but not directed toward the person of the libellant of settled purpose to injure and distress, would not, of themselves, justify the dissolution of the marriage contract.

Our conclusion is that the acts complained of, so far as they are supported by competent testimony, while reprehensible and offensive, do not establish the charge of indignities to the person.

### Order.

And now, May 21, 1926, for the reasons stated in the foregoing opinion, the libel is dismissed, at the cost of the libellant.

From Luke H. Frasher, Uniontown, Pa.