## Magyar, Appellant v. Magyar.

Argued November 21, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, RHODES, HIRT and KENWORTHEY, JJ.

*Joseph G. McKeone,* for appellant.

*Edmund H. Szlapka,* for appellee.

OPINION BY KENWORTHEY, J., February 28, 1942:

This divorce action was instituted by the husband, alleging cruel and barbarous treatment and indignities. There was no evidence of cruel and barbarous treatment. The evidence of indignities was conflicting. The master recommended the divorce. The court below declined to adopt the recommendation and refused the divorce. Libellant has appealed.

We have concluded, after a careful examination of all of the evidence, that the learned court below erred and a divorce should be granted.

The parties were married November 6, 1924. Libellant is approximately thirty-nine, respondent thirty-seven years of age. There were two children, both daughters, who, at the time of the hearings in May 1940, were aged thirteen and eleven. Since the separation they have lived with the libellant. From the evidence, respondent appears the more aggressive personality. She worked hard as a factory worker through most of her married life; she, in addition, did most of the housework (although there is evidence it was not always done very well); and she nevertheless had enough energy in reserve to engage with libellant in numerous verbal—and sometimes physical—battles, which admittedly took place between them. Libellant was a cabinetmaker by trade, but, except for a period of three or four months immediately after the marriage, he was not very regularly employed; at one time he opened his own shop, but the adventure was short-lived; he enjoyed working with his hands and spent much time in the workshop which he maintained in the cellar of his home, where, among other things, he made ship models; he was interested in good music and, except when respondent interfered, spent much time listening to it on the radio; in the summer he frequently attended the musical concerts in Fairmount Park, Philadelphia. After the marriage, he took a night course in architecture at the Drexel Institute of

Technology. His brother, who was Secretary of the Pennsylvania Academy of Fine Arts, and who made a very favorable impression on the master, testified that he witnessed many quarrels in which the respondent was usually the aggressor and libellant, though occasionally standing up for himself, was usually the patient listener.

Libellant described a course of conduct, which if true, clearly amounted to indignities: Respondent constantly nagged him; falsely accused him of improper relations with other women; abused him with opprobrious names in the presence of others, including the children; threatened to kill him; suggested that he commit suicide as he wasn't any good; locked him out of the house; maintained the house in a filthy condition; abused one of the neighbors toward whom he was friendly; ridiculed his short stature; nagged him about staying out late at night and, on numerous occasions, left all the lights lit so that—according to her—all the neighbors would see when he came home. There was some corroboration of his testimony; he called the two children, who testified that respondent frequently swore at him and called him vile names in their presence; he was also corroborated by members of his own family and, on one feature of the case, by a disinterested witness.

Respondent's principal grievance was that libellant went out three or four nights a week and she undertook to prove that, on several occasions, he went out with other women. But on the only occasion about which there was any convincing evidence her brother and sister-in-law were present, libellant and the woman were not alone during any part of the evening and there was no suggestion of immoral conduct. See *Hexamer v. Hexamer*, 42 Pa. Superior Ct. 226, 240. She admitted nagging him about going out at night with other women. We are satisfied, from the evidence, that she was habitually vulgar and quarrelsome, not only

with him, but with members of his family with whom they lived during much of their married life.

The solution of the conflicting testimony resolves into a determination of the credibility of libellant's testimony, the contradiction of which is limited for the most part to denials by respondent. A complete summary of the evidence for the purpose of demonstrating why we think the weight of the credible evidence supports libellant's case is, of course, not practicable. We shall confine ourselves to a few illustrations. On direct examination, and again on cross-examination, respondent testified that it was her customary practice to turn over to libellant *all* her earnings every week and that out of these sums libellant limited her to $8 a week for food for the home. She was very emphatic about it. In fact, one of her minor complaints was that libellant never bought her any clothes. Yet, in another place, she admitted she had saved $500 out of her earnings and (when it, for the moment, served her purpose) insisted that she had bought all her clothes and the clothes for the children. Another of her complaints was that libellant had taken her out on only two occasions during the last year they had lived together. What happened on those two occasions furnishes a justifiable explanation. On one of them, they had gone to a party at the home of friends and after respondent had had a few drinks (this is her own version) someone dared her to smoke a cigar. She proceeded to accept the dare and, since she was not used to smoking, the inevitable happened—she became so violently ill libellant was compelled to take her home. He said he was extremely embarrassed by the incident. On the second occasion, they went to a party at the home of the same friends. When all the guests were assembled on the porch and while libellant was engaged in conversation with one of the women guests, respondent suddenly flew into a rage, accused him of attempting

to "make" the guest and, as a result of the episode, he and respondent left the party. There was evidence that respondent used vile language. She admitted she made the accusation, but denied the vile language, and insisted that she had overheard libellant invite the woman to attend a musical concert the following week. His denial of the invitation was corroborated by a disinterested witness and the unlikelihood that such an invitation would have been extended in the presence of respondent seems apparent. Finally libellant testified that on one Sunday morning his mother had called him up and asked him to come to her home for the purpose of doing a little carpentry job for her, that he had agreed to go and, when about to leave, discovered respondent had hidden his tools because she didn't want him to go. She admitted the accusation, but gave as an excuse that she wanted "to see whether he would really help me or not."[1]

There is one final feature of the case to which attention may be called. We think it not without some significance that the two daughters have voluntarily lived with libellant since the time of the separation. The master made much of their testimony. He said: "The daughters are 13 and 11 years of age and are manifestly bright girls and fairly mature for their age. They each had an open, candid manner which of itself seemed persuasive evidence that they were telling the truth as they saw it ...... As will be seen they testified strongly for the father, stating the mother had often

---

[1]Testimony on the point is as follows: "Q. He said in the spring on a Saturday in 1938 his tools were gone. Did you do anything about his tools? A. I put them away. Q. Why? A. Because I had washing to do, dishes, and cleaning to do, and the next day the two children and three other women were supposed to go to Atlantic City and I asked him to help out, but he would not help out with the work, he would not do it. Q. Did you hide his tools? A. Yes. Q. Maliciously? A. No, just to see whether he would really help me or not."

sworn at him; that he frequently had to cook and help with the housework, etc. and that they and he did most of the housework. Elaine heard her strike him and threaten to burn the house down. In an attempt to show bias in the children, Mr. Wade brought out strongly the fact of their having lived with the father and his folks for sometime. That merely carries us back, however, one step further. Why did they go with the father and remain with him without strong objection or question, if they were not prompted by their innate feelings and preference?" The judge of the court below was unwilling to give their testimony much weight because it "had very little detail," "expressed conclusions," "was somewhat uncertain and of no material scope." But we think he overlooked the unspoken significance of "their innate feelings and preference."

The decree of the court below is reversed and the record is remitted to the court below with direction to enter a decree of absolute divorce.