# Gordon *versus* Gordon.

*Act of March 9th* 1855, *relative to divorce, construed.— What conduct warrants a divorce a mensa et thoro under the act.*

1. The Act of March 9th 1855, relating to divorces, does not provide new causes of divorce beyond those ordained by then existing laws, but only enlarges the jurisdiction of the courts in reference to the parties.

2. Personal abuse or indignities offered by a wife to her husband will not justify him in turning her out of doors; he must show such cruel and barbarous treatment as renders his condition intolerable and life burdensome, or "endangering his life;" such as would entitle him to a divorce.

3. Thus, where only insults, abuse, and personal indignities by the wife are proven by the husband, in justification of his turning her out of doors, it was not error in the court, in an action of divorce a mensa et thoro brought by her, to rule that the evidence did not come up to the standard of justification, and to submit the case to the jury on the question whether there had been a turning out of doors.

[Gordon v. Gordon.]

ERROR to the Common Pleas of *Washington county*.

This was a libel in divorce from bed and board, and for alimony, by Jane Gordon against David Gordon, presented August 29th 1857, in which there was an issue which was tried by a jury and verdict rendered for the libellant; whereupon, on the 31st day of May 1862, a decree was made by the court divorcing the said parties *a mensa et thoro*, and on the 26th of February 1864, alimony was fixed at $100 per annum.

The petition alleged that the parties were married on the 6th day of July 1855, and lived and cohabited together until April 29th 1857, on which day, "and at various other days and times," the defendant turned "the libellant out of doors, and offered such indignities to her person as to render her condition intolerable, and life burdensome, and thereby forced her to withdraw from his house and family;" and prayed for a divorce from bed and board, and for alimony.

The answer admitted the marriage on July 6th 1855, but the defendant denied all the other material allegations in the libel, and emphatically denied that, on April 29th 1857, or at any other time, he turned the libellant out of doors, or offered such indignities to her person as to render her condition intolerable, and life burdensome, and thereby forced her to withdraw from his house and family; but, on the contrary, averred that the libellant left the house of the defendant of her own accord, declaring her determination never to return thereto; and averred further, that the libellant, by her loose and immoral conduct, and her ungovernable temper, causing her to commit acts of violence on the person of the defendant, destroyed the peace and comfort of his family, and rendered the condition of the defendant intolerable, and life burdensome. The defendant prayed that the libel be dismissed, or an issue be directed.

The replication denied that the libellant left the house of the defendant of her own accord, declaring her determination never to return thereto, and averred that she did not leave his home until she was turned out thereof by the defendant; and she denied all the material averments in the answer.

Among the points presented to the court below, the respondent requested the court to instruct the jury, 2. That if the facts testified to as to the obscene and abusive language, the immoral conduct, the intemperate habits, and the violent acts of Mrs. Gordon, and her treatment of her husband, are proved to the satisfaction of the jury, they are such as would entitle David Gordon to a divorce, and therefore constitute a legal justification of his refusal to consent to her return to his house and family; which the court refused.

In the general charge, the court below (LINDSEY, P. J.) instructed the jury as follows:—

[Gordon *v.* Gordon.]

" The plaintiff claims a divorce, *a mensa et thoro*, upon two different and distinct grounds, viz. :

" 1st. That, being the wife of the defendant, he maliciously turned her out of doors.

" 2. That the defendant offered such indignities to her person as rendered her condition intolerable, or life burdensome, and thereby forced her to withdraw from his house and family.

" We shall first notice the second ground alleged, because it is first in order of time. In doing so, it is necessary to inquire, what indignities will be sufficient to justify her in withdrawing herself from his house, and invoking the protection of this provision of the law? And we say to you that the fact that a husband sleeps in a different bed from that occupied by his wife, and declines to exercise his marital privileges respecting the enjoyment of conjugal endearments, is not sufficient: 11 Harris 343.

" And we instruct you the clause of the Act of 1817, specifying this as one of the grounds of divorce, contemplates more than a single deed of harshness or abuse, or than any merely illegal act. It speaks of such a *course* of conduct or *continued* treatment as renders the wife's condition intolerable, and her life burdensome. And, in general, mere rudeness, reproachful language, want of sympathy; disagreeable manners, ebullitions of ill temper, &c., are not to be taken as just cause of separation. But a long-continued course of humiliating insults and annoyances, amounting to treatment which endangers her life or health, are sufficient. You will observe, however, that in this case there is no evidence that either the life or the health of the plaintiff was endangered by any treatment she received from her husband.

" Personal violence, or the reasonable apprehension of it, caused by repeated and continued threats and menaces, have been held sufficient cause of separation, but you must judge of these acts and threats by the circumstances surrounding them, and in their connection with the character and conduct of the parties. And you will bear in mind that indignities provoked by the complaining party are no ground of divorce, unless the retaliation is excessive.

" Keeping these general principles in view, you will apply them to the evidence in the cause. The indignities complained of by the plaintiff are, 1st. *The refusal to sleep with her.* This, we have instructed you, is no cause for her withdrawal, or for a divorce. 2d. *That defendant pinched or bruised her arms.* Of this there is very little evidence. A witness saw black marks upon her arms, and she stated, in presence of another witness, that the defendant had pinched them, and assigned that as

[Gordon v. Gordon.]

one cause of her leaving his house. There is no evidence that defendant did actually strike or injure her arms. 3d. *That defendant, on one occasion, used, or threatened to use a wagon-whip on her.* There is no proof of this, except the declarations of plaintiff, made in the presence of defendant. When most of these statements were made, defendant denied her statements; and hence they do not amount to anything. On the occasion testified to by Esq. Pollock, her declaration was made in his presence, under such circumstances of violence and bad conduct on the part of the plaintiff, that it was impossible for defendant to reply to the charge. To Mrs. Ray defendant admitted he had taken the whip in his hand, but stated he did not intend to strike plaintiff with it. And to Mr. Crawford and others, when charged by plaintiff with using the whip on her, he gave a detailed statement of the circumstances, and protested he only got the whip to keep her away from him.

"Now we say to you, that if defendant merely threatened to use the whip on the plaintiff, without actually using it, and this only a single occasion, under the circumstances stated, it is not sufficient for separation. And if he did actually strike her with it, on only one occasion, being provoked to do so by the peculiar annoyances and disgraceful conduct of the plaintiff, as described in the testimony of Crawford and of James Gordon, still it would not be good cause for abandoning his habitation, or for divorce.

"We come, now, to notice the second ground relied upon by plaintiff. And she claims that there was both an *actual* and a *constructive* turning out of doors. To prove that defendant *actually* turned her out, she relies upon the testimony of Mrs. Ray and others." (The court here read the testimony to the jury.)

"The defendant, to disprove this allegation, relies upon the testimony of Mrs. Kerr and Mrs. Donaldson, and also upon that of his children, who saw her depart." (The court here read their testimony to the jury.) "Perhaps the evidence does not very satisfactorily show that there was an actual turning out of doors, but this is a question for you, and if you shall determine that there was, it will, under the instructions we shall hereafter give you, dispense with the necessity of going into any inquiry as to the nature of the virtual or constructive turning out of doors. If, as will probably be the case, you shall find that the proof does not show an actual turning out of doors, you will proceed to another view of the case.

"To prove what I have called a constructive turning out of doors, plaintiff relies upon the testimony of James Shannon, Henry McCluskey, Matthew Crawford, and William Moorhead.

[Gordon *v.* Gordon.]

Mr. Shannon is somewhat contradicted, and is not very explicit about the agency of defendant in fastening the door at the time he speaks of. But McCluskey and Crawford testify that in June 1857 plaintiff returned to defendant's house, requesting permission to remain and live with him, and that defendant refused to allow her to do so, but ordered her to depart, accompanying this order with a threat of calling in an officer to eject her.

"Now did the plaintiff, in thus returning to the house of defendant, and asking to remain, really and honestly intend to live with him, and to discharge, as well as she could, the duties incumbent upon her as his wife? If her return was in good faith, and for the purpose we have stated, then we instruct you that the refusal of defendant to allow her to stay, and his ordering her away, constitute a virtual turning out of doors, and will entitle plaintiff to your verdict, unless defendant had reasonable cause to justify him in this proceeding.

"What is such reasonable cause?

"It is settled, in Pennsylvania, that reasonable cause of defence is such cause as would entitle the party to have a divorce if he were himself seeking it: 10 Harris 276; 11 Id. 345; 1 Wright 447.

"Has the defendant such a case as would entitle him to a divorce if he were seeking it at our hands? To answer this question intelligently we must refer briefly to our several Acts of Assembly relating to divorces.

"The Act of 1815 makes no provision for divorce from bed and board. It provides only for a dissolution of the marriage bond. It recognises various causes for divorce: but of causes occurring subsequently to the marriage there are only two which will afford ground of divorce to the husband, viz.: the wife's adultery, or her desertion, and absence from his habitation for two years.

"Thus remained the law up to 1854. The Act of 1817, while it provides for a divorce from bed and board for certain causes for a wife, made no alteration respecting the situation of the husband. No matter how scandalous, barbarous, or brutal was the conduct of a wife, if she stopped short of adultery or desertion, the courts had no power to dissolve or to relax the bond in favour of the husband. The Act of 1854 came to his relief. Extending the causes of divorce to two new grounds which are common to the husband and the wife, it makes a third ground peculiar to the husband. 'When the wife shall have, by cruel and barbarous treatment, rendered the condition of her husband intolerable, and his life burdensome.' This clause is similar, in language and idea, to a cause of divorce given to the wife by the Act of 1815, and copied into the Act of 1817; but in neither

[Gordon v. Gordon.]

language or idea is it identical with the corresponding clauses in those acts. The 'indignities to the person' which have been so prolific of divorces under the acts last named, find no place in the Act of 1854. And it is to be borne in mind that this Act of 1854 contains the important provision that where the husband obtains his divorce under it, the wife shall, nevertheless, have alimony.

["It is contended by defendant's counsel that the Act of 1855 creates additional causes for divorce, and that defendant has shown such a cause as will, under it, entitle him to a divorce. We have examined that act with some care, and we think it does nothing more than extend the jurisdiction of the courts to cases where the parties were at the time of the occurring of the cause of divorce domiciled out of this Commonwealth. And the supplement, passed in 1858, is entirely consistent with this view. Without entering upon a discussion of the reasons for this opinion we instruct the jury that the Act of 1855 has no application to the case.]

"It cannot be claimed that either of the causes mentioned before, as availing the husband for a divorce under the Act of 1815, will afford a defence to the defendant in this case. Admitting that the withdrawal of the plaintiff from his house was without cause, still the desertion and absence were not continued for two years. Neither can any allegation of adultery on the part of the wife be raised here. As we have already stated, the bill of the libellant bases her claim to a divorce upon two grounds. The answer of respondent, while denying these, does not charge the libellant with adultery, but only with this, viz., that 'her loose and immoral conduct and ungovernable temper, causing her to commit acts of violence upon the person of the respondent, destroyed the peace and comfort of his family, and rendered the condition of the respondent intolerable, and his life burdensome,' &c.

"Under the bill, answer, and replication, which constitute the pleadings in the case, the jury have nothing to do with the question of the plaintiff's adultery. This allegation has not indeed been insisted on by counsel. We understand there is a suit pending, in which the present defendant seeks to obtain a divorce from the bonds of matrimony on the ground of his wife's adultery; and perhaps he did not for this reason deem it advisable to raise that issue here. In this connection also we withdraw from your consideration all the evidence relating to the character of plaintiff for chastity. At the time of its admission we did not advert to the fact that the answer contained no allegation of adultery. We do not, however, withdraw from your consideration the evidence introduced by defendant to show the loose con-

duct and shameful behaviour of plaintiff: we think this, and the testimony showing the actual relations of the parties, were proper, to enable us to comprehend fully the nature and extent of the alleged indignities to the person of plaintiff, and likewise as having some possible bearing upon the *animus* with which plaintiff returned to the house of defendant, and made her offer to live with him.

" But to return : The defendant has no defence under the Act of 1815—he does not claim to have.

" Can he defend himself upon the ground of divorce provided by the Act of 1854?

" We are inclined to think (although we do not so instruct the jury), that where a wife is entitled to her divorce for being turned out of doors, the husband cannot have a reasonable cause of defence short of those causes which would entitle him to a divorce under the Act of 1815. There are many reasons for not allowing him to use the causes of divorce created by the Act of 1854 as a defence. We will notice one of them. That act provides that if the husband shall obtain a divorce for either of the causes therein specified, he shall pay alimony to his wife. Now, the object of the plaintiff in instituting this proceeding is to recover alimony. If we decide that the defendant, by reason of her cruel and barbarous treatment of him, was justified in refusing to permit her to return to him, we do, to some extent, establish a legal separation between them, and we decide, at the same time, that plaintiff shall not have alimony. We say she shall not return, and yet, that she shall have no certain support from her husband; we virtually extend to the defendant the benefit of the Act of 1854, while we release him from the condition which the act itself imposes as the price of its favour. We agree that this course of reasoning is not conclusive, and we do not think it necessary to determine the sufficiency or insufficiency of the defence upon this ground.

["Aside from it, the defendant could, in any event, defend himself under the Act of 1854 only by showing that plaintiff has, by her cruel and barbarous treatment of him, rendered his condition intolerable, and life burdensome. Does his evidence come up to this standard? We think it does not. True, it shows that the conduct and language of plaintiff were at times most disreputable. We sympathize with the defendant. We make no excuse for plaintiff. It is surely a great calamity to be united in wedlock to a woman who can condescend to such outrageous behaviour, and such vulgar, obscene language in the presence of her family as the evidence discloses against the plaintiff. But it is better that individual hardships should be borne by the party whose folly or passion has caused them, than that the great

[Gordon v. Gordon.]

interests of society should be perilled by tampering with the marriage tie. At all events, it is our duty to interpret the law as we find it, and we think that the testimony of the defendant does not show such cruelty and barbarity of treatment as would entitle him to a divorce under the Act of 1854, and hence cannot avail him as a defence here.]

"And this would seem to have been the view of the defendant himself, for, in his answer he does not put his defence upon plaintiff's 'cruel and barbarous treatment' of him, but upon her 'loose and immoral conduct, and ungovernable temper,' which caused her 'to commit acts of violence upon the person of the respondent, destroyed the peace and comfort of his family,' &c.

["In conclusion, we instruct you that the whole case turns upon the inquiry whether there was a turning out of doors;] and we say, that the refusal of defendant to permit plaintiff to remain in his house, as testified by McCluskey, Crawford, and Moorhead (if you believe them), was a sufficient turning out of doors, and will entitle plaintiff to your verdict, provided you shall find that her return and expressed desire to remain were in good faith, and with a purpose to perform her duties as a wife as well as she reasonably could. If her return and offer to remain were only a sham, and a trick—an artifice to make out a case for the recovery of her alimony, of course the refusal of defendant to permit her to stay would not be a turning out of doors. And the fact that she resorted to such an artifice would be a weighty circumstance against her on the question of an actual turning out of doors."

Under these instructions there was a verdict and judgment in favour of the libellant, from which the respondent appealed, averring that the court below erred in refusing to affirm the point above mentioned, and in instructing the jury as was done in that part of the general charge printed above in brackets.

*W. McKennan* and *Acheson & Wilson,* for appellant.

*Montgomery & Gibson,* with whom were *Gow & Murdock,* and *Watson,* for appellee.

The opinion of the court was delivered, January 2d 1865, by
STRONG, J.—This was a libel for divorce, "*a mensa et thoro,*" in which the libellant set out two causes for a separation. They were, that the defendant, her husband, had "turned her out of doors," and "that he had offered such indignities to her person as to render her condition intolerable and life burdensome, and thereby force her to withdraw from his house and family." The

[Gordon *v.* Gordon.]

answer of the defendant denied these allegations, and also pleaded in avoidance, "that the libellant, by her loose and immoral conduct and her ungovernable temper, causing her to commit acts of violence on the person of the defendant, destroyed the peace and comfort of his family, and rendered his condition intolerable and life burdensome." To the answer there was a general replication traversing all the averments of the defendant. The issues thus formed were submitted to a jury, and the errors assigned relate to the charge of the court given on the trial.

Before proceeding to a consideration of the several exceptions taken, it may be observed that the main contest before the jury, if not the only one, had reference to that averment in the libel which asserted that the defendant had turned the libellant out of doors, either actually or constructively, by refusing to permit her to remain in his house when she offered to remain with a purpose to perform in good faith her conjugal duties. That he had refused to permit her thus to remain was distinctly proved by several witnesses, and the verdict of the jury has established this averment in the libel. Whether the conduct of the libellant had been such as to justify the act of the defendant, was then the only remaining question. Upon this the court was requested to instruct the jury, that if the facts testified to by several witnesses named, as to her obscene and abusive language, the immoral conduct, the intemperate habits, and the violent acts of Mrs. Gordon, and her treatment of her husband, were proved to the satisfaction of the jury, they were such as would entitle David Gordon, the defendant, to a divorce, and therefore constituted a legal justification of his refusal to permit her to return to his house and family. Such instruction the court refused to give, holding that the cause which will justify a husband in turning his wife out of doors is such cause only as would entitle him to a divorce if he were seeking it, and that the evidence of the conduct of the libellant did not exhibit a case which, under any Act of Assembly, is a sufficient cause for decreeing a divorce at the suit of a husband. To this the first three errors are assigned, and they are so intimately connected with each other that they may best be considered as one. That the rule was correctly given by which the alleged justification of the defendant was to be measured, may be seen by reference to Eschback *v.* Eschback, 11 Harris 343, and Grove *v.* Grove, 1 Wright 447. Of this indeed there is no complaint. But it is insisted that the conduct of the libellant, as exhibited by the evidence, had been such before she was ejected from the defendant's house, as to amount to one of the causes for which a divorce is allowed to a husband by the Act of Assembly. That it was bad, shamelessly bad, must be conceded. That it was such as to call for the abhorrence of every right-minded man, appears plainly from the

evidence. But it is not all bad conduct of a wife which entitles a husband to a divorce. Causes sufficient for that are such only as are defined in the Acts of Assembly. Under our statutes a distinction has always been made between the causes for a divorce at the suit of a wife, and those which justify a divorce at the suit of a husband. The Act of 1815 made no provision for a divorce by either party from bed and board. It authorized only a dissolution of the marriage bond, and of causes occurring subsequently to the marriage there were only two which were sufficient to entitle the husband to a divorce. They were the adultery of the wife and her wilful and malicious desertion of her husband, and her absence from his habitation without reasonable cause for two years. Though under that act the wife might claim a divorce for her husband's cruel and barbarous treatment endangering her life, or for such indignities offered by him to her person as to render her condition intolerable and life burdensome, and thereby force her to withdraw from his house and family, no such privilege was granted to the husband. It was doubtless not supposed that he was in equal danger of cruel and barbarous treatment endangering his life, or of indignities offered to his person such as to render his condition intolerable and life burdensome, and force him to withdraw from his family. He was thought able to protect himself. Hence no provision was made for such a case. This act was followed by the Act of 1817, which authorized a divorce from bed and board, with alimony, for certain causes, at the suit of the wife, but it made no alteration in the rights of the husband. It added no new cause to those which had previously been declared sufficient grounds for decreeing a divorce at his suit. Provision was made for a partial divorce at the suit of the wife for four distinct causes. They were, malicious abandonment by the husband of his family, turning the wife out of doors, endangering her life by cruel and barbarous treatment, and offering such indignities to her person as to render her condition intolerable or life burdensome, and thereby force her to withdraw from his house and family. The Acts of Assembly authorizing divorces remained in this condition substantially until 1854. In the intervening time some enactments were made to remedy mischiefs supposed to exist, but none of them gave a husband a right to sue for a divorce from bed and board, or from the bonds of matrimony, for any other cause than such as had been declared sufficient for him by the Act of 1815. In Dorsey v. Dorsey, 7 Watts 349, it was decided by this court that the legislature had not conferred upon Courts of Common Pleas jurisdiction of a cause of divorce alleged to have been committed by the husband whilst his domicil was in another state, and that the law of the actual domicil at the time and place of the injury is the rule in cases of divorce for

everything but the original obligation of marriage. To meet in part this decision, the Act of 27th of February 1847 was passed, by which an attempt was made to validate divorces granted for adultery, if the offence was committed in this Commonwealth, and if the libellant had resided therein one year previous to the application for the divorce, although at the time of the commission of the offence the libellant and respondent may have been residents· of another state. This was followed by the Act of April 26th 1850, which empowered the Courts of Common Pleas to entertain jurisdiction of all cases of divorce for the cause of desertion, notwithstanding the parties were at the time of the desertion domiciled in any other state. It did not reach a case where the parties were domiciled in any foreign country not one of the United States: Bishop *v.* Bishop, 6 Casey 412. By the Act of May 8th 1854, the jurisdiction of the courts was enlarged. They were authorized to grant divorces for other causes than those specified in the Acts of 1815 and 1817. These new causes were fraud, force, or coercion in the procurement of the marriage, if it had not been subsequently confirmed by the act of the injured party, and conviction of felony and sentence to either a county or a state prison, where the application is made by the husband or wife of the party convicted. Both these causes are equally available where the divorce is sought by the husband as when it is sought by the wife. The act also extended to the husband a right to a divorce where the wife shall have by cruel and barbarous treatment rendered the condition of her husband intolerable or life burdensome, but required that he should pay alimony whenever a divorce for such a cause should be decreed at his instance. This does not give a husband a right to a divorce for all the causes for which a wife was entitled under prior acts. It does not undertake to make the rights of the husband and wife equally extensive. Cruel and barbarous treatment is added to the causes for which he is entitled to a divorce, but personal indignities, a cause which former acts had carefully distinguished from cruel treatment, is not added.· True, the language of the act differs slightly from the words of the Acts of 1815 and 1817, but so slightly that it is evident the legislature had only cruel and barbarous treatment in view. There was, as has been intimated, a reason why protection against personal indignities should be extended to the weaker and more sensitive party, and at the same time be denied to the husband. The Act of March 9th 1855 gave to neither of the parties any new cause of divorce. Its sole purpose, like that of the Act of 1850, was to extend the jurisdiction of the courts. The first of these acts had only extended jurisdiction over parties domiciled in another state where the offence was committed, to cases of

[Gordon *v.* Gordon.]

divorce from the bonds of matrimony for the causes of desertion and adultery. It did not confer jurisdiction in cases of such domicil of the parties, in any libel for a divorce, where the injury complained of was either cruel and barbarous treatment or personal indignities. To remedy this omission was the design of the Act of 1855. Neither of these two acts undertake to define any cause as sufficient grounds for a divorce, though they both refer in general terms to the causes which had previously been defined. It would be giving to them a meaning never intended were we to hold that they had any other object in view than the enlargement of the jurisdiction of the courts over parties. It might as well be ruled that the Act of 1850 authorized divorces for desertion, without continued absence, as that the Act of 1855 created a new and distinctive cause.

In the light of this legislation it is obvious the court below was right in refusing to affirm the defendant's point, and in holding that he could justify turning the defendant out of doors only by showing that by cruel and barbarous treatment she had rendered his condition intolerable and life burdensome; or in the language of the Acts of 1815 and 1817, " endangering his life;" in ruling that his evidence did not come up to that standard, and in putting the case to the jury on the single question, whether there had been a turning out of doors. Indeed, in strictness, to enable him to make use of any justification he should have pleaded it, for it was matter in evidence. But his answer made no averment of the libellant's cruel and barbarous treatment. At most it averred personal indignities, which, however censurable and provoking, could not be enough for justification. And his evidence did not excel his averments. It proved insults and personal indignities of the grossest character, hard to be endured, but they are not the cruel and barbarous treatment, which either endangers life or renders the condition intolerable or life burdensome. To hold that they are, would be to confound causes of divorce which the legislature has separated, and which have always been distinguished in judicial decisions. Conceding now that the defendant could have justified turning his wife out of doors, in this proceeding of hers for a divorce from bed and board and for alimony (which for the purposes of this case may be conceded), by showing cruel and barbarous treatment inflicted by her upon him, he must still have shown such cruel and barbarous treatment as under the Acts of Assembly would have authorized the court to grant him a divorce had he applied for it. We will not go into the question which has given the English courts and those of other states so much trouble, what is the cruelty that is ground for a separation. Perhaps the language of our Act of 1815 solves the difficulty by describing it as such treatment as endangers life. However that

[*Gordon v. Gordon.*]

may be, we are clearly of opinion that the cruel and barbarous treatment spoken of by the Act of 1854, is the same as that described in the Acts of 1815 and 1817, notwithstanding the slight difference of language. If not, then the husband may obtain a divorce for a less degree of cruelty than would suffice to entitle the wife to a divorce. It is hard to believe that the legislature intended any distinction in favour of the husband. In *Butler v. Butler*, 1 Pars. Eq. Cas. 329, Judge King defined "cruelty" to the wife within our statute of 1815, "as actual personal violence or the reasonable apprehension of it, or such a course of treatment as endangers life or health and renders cohabitation unsafe." This definition accords with the present doctrine of the English ecclesiastical courts. It gives the extremest possible liberal construction to our Act of Assembly. Tried by this rule, the defendant gave no evidence of cruel and barbarous treatment, such as could justify his "turning the libellant out of doors;" and therefore we are constrained to affirm the judgment, though we do it reluctantly.

The decree of the Court of Common Pleas is affirmed.