## Orr v. Orr

*David W. Ketler*, for plaintiff.

*Warren R. Keck, Jr.* and *Philip E. Jacobus*, for defendant.

McKay, J., March 16, 1956.—This case is before the court on exceptions by defendant to the report of a master in divorce. The master recommends the granting of a decree of divorce a vinculo matrimonii to plaintiff on the ground of indignities to the person, committed by the wife.

The parties were married July 3, 1942, in Macon, Georgia, while plaintiff was in the military service. Since his discharge on September 18, 1945, and until their separation in 1953, they have lived in the Borough of Grove City, Mercer County, where he has been employed as an X-ray technician at the Bashline-Rossman Hospital. One child, Eddie Jo, was born in 1948. In late June or early July of 1953, the parties sold their house and five acres of land near Grove City, and most of their personal property, and plaintiff assisted his wife in moving the rest of it to Kane, in McKean County. Thereafter, he visited her on several weekends, during which times they lived together in her apartment in Kane as husband and wife. He retained his position in Grove City where he lived in a rooming house.

In August, 1953, on one of his visits to Kane, he asked his wife for a divorce, and later presented her with separation papers which she refused to sign.

In April, 1954, plaintiff went to Reno, Nevada, where, on May 17, 1954, he instituted a proceeding for divorce. In the complaint he set forth that for "more than six weeks last past and immediately preceding the commencement of this action, he had been and still is an actual and bona fide resident of the county of Clark, State of Nevada."

Defendant contested the Nevada divorce proceeding, whereupon plaintiff discontinued it and returned to Grove City on June 24, 1954.

On November 23, 1954, the wife instituted a proceeding for divorce a mensa et thoro in the court of

common pleas of McKean County, at no. 137 December term, 1954, alleging that her husband committed indignities to her person and had maliciously turned her out of doors. The charge of indignities was not pressed. The husband contested the proceeding. On August 17, 1955, the court found that the husband had maliciously turned his wife out of doors and granted the wife a divorce from the bed and board of her husband, and allowed Mrs. Orr the sum of $100 per month alimony.

On January 3, 1955, plaintiff filed a complaint in the present action, alleging that he had been a Pennsylvania resident for more than one year.

The exceptions raise three questions:

1. In view of plaintiff's Nevada divorce proceedings and the averments as to residence contained in the complaint in that case, was plaintiff husband a bona fide resident of Pennsylvania for at least one year prior to the filing of his complaint in divorce in the present case?

2. Does the McKean county decree of divorce from bed and board preclude plaintiff from bringing an action for and obtaining an absolute divorce in the present proceeding by the application of the doctrine of res judicata?

3. Does the evidence as to defendant's alleged misconduct amount to indignities to the person of plaintiff husband?

The question of plaintiff's residence is not a difficult one. Notwithstanding his averment in the complaint which he filed in Nevada on May 17, 1954, which was within a year of the filing of the complaint in the instant case, the evidence was conclusive that plaintiff was continuously a bona fide resident of Grove City, Mercer County, for over 25 years prior to the filing of the complaint in this case.

When he left Grove City for Nevada in April of

1954 he had a contract with the hospital which did not expire until August of that year. He made arrangements with the hospital for a leave of absence for a couple of months. In addition, he arranged with his landlady to get his room back when he returned, if it was still vacant. He took with him but one suitcase and stored his personal belongings with a friend, asking the latter to look after them until he returned. He retained the hospital in Grove City as his mailing address. He did not change his voting address. He testified that he did not have any intention to make Nevada his permanent home. He explained the contradictory statement in his complaint by stating that he signed what his attorney in Nevada had drawn up for him to sign in order to get a divorce. It is obvious that his short stay in Nevada was solely for the purpose of attempting to qualify as a litigant under the liberal divorce laws of that State and was with no intention on his part to establish an actual residence in that State. He, therefore, had a legal, bona fide residence in Pennsylvania and was entitled to file the complaint in the present case.

"It has been repeatedly held that mere temporary absences from the state of domicile during the year preceding the filing of a libel will not, in and of themselves, defeat the right of the libellant to invoke the jurisdiction of the proper court of the state of which he is technically a citizen.": Huston v. Huston, 130 Pa. Superior Ct. 501.

The second question raised by the exceptions is whether the McKean County decree in the proceeding for divorce from bed and board constitutes a bar to plaintiff's present proceeding for absolute divorce.

Our appellate courts have decided that a proceeding in the court of quarter sessions under the Act of April 13, 1867, P. L. 78, resulting in an order for the payment by the husband of an allowance to his wife for her

support, will not bar a divorce at his suit on the ground of desertion, although the record of such suit is admissible in a divorce proceeding and is evidence against the husband which requires a strong case to overcome: Loughney v. Loughney, 111 Pa. Superior Ct. 214.

On the other hand, the court of common pleas of Beaver County, in the case of Foster v. Foster, 70 D. & C. 485, held that a husband was barred from bringing an action in divorce against his wife on the ground of desertion when an Ohio court, having jurisdiction over the parties, had entered a decree for permanent alimony and separate maintenance in favor of the wife, in which it was found that defendant had been guilty of extreme cruelty and gross neglect of duty towards plaintiff. The court held that inasmuch as the Ohio court would have deprived the husband in that case of the right to relitigate the same matters in a divorce action brought by him in Ohio, the Pennsylvania court should attribute a similar decree of finality to the Ohio decree for alimony.

Neither of these precedents, however, controls the case before us.

A proceeding for divorce a mensa et thoro is distinguishable from an action for nonsupport. The latter is a criminal proceeding in which the Commonwealth is plaintiff. In the former, the husband and wife are the only parties. The divorce from bed and board is an action for divorce provided for in the Divorce Law approved May 2, 1929, P. L. 1237. Section 11 of that act reads as follows:

"Upon complaint, and due proof thereof, it shall be lawful for a wife to obtain a *divorce* from bed and board, whenever it shall be judged, in the *manner hereinafter provided in cases of divorce,* that her husband has: (a) Maliciously abandoned his family; or (b) Maliciously turned her out of doors; or (c) By

cruel and barbarous treatment endangered her life; or (d) Offered such indignities to her person as to render her condition intolerable and life burdensome; or (e) Committed adultery." (Italics supplied.)

The procedure is comparable to that in actions for absolute divorce. Some of the grounds, including indignities to the person, are identical with those in cases of absolute divorce. Historically, divorces from bed and board antedated absolute divorces, the earliest divorces being limited by the ecclesiastical courts of England to divorces a mensa et thoro.

It is true that our Superior Court, in the case of Rutherford v. Rutherford, 152 Pa. Superior Ct. 517, at page 525, stated:

"Mrs. Rutherford has not asked for divorce from the bond of matrimony. She asked for and was granted a divorce from bed and board, which is little more than an adjudication that she could live apart from her husband without being guilty of desertion."

Nevertheless, a divorce from bed and board is a formal adjudication establishing certain very substantial rights of the parties. While it may be terminated at the will of the parties by their consenting to live together again, until they do so, the decree is binding upon them and determinative of their status and even their property rights. The Act of April 11, 1927, P. L. 181, 48 PS §117a, permits a wife who has been granted a divorce from bed and board to mortgage or convey her own real estate without the joinder of her husband.

In our opinion, therefore, a divorce from bed and board is of such a nature that the principle of res judicata applies to any question decided in that proceeding which is subsequently raised in another proceeding between the same parties for absolute divorce.

The question before us then is whether the principle of res judicata applies to the particular question of indignities to the person of this plaintiff so far as the

two divorce proceedings between these parties are concerned.

The rule of res judicata has been stated as follows:

"Broadly stated, the rule of res judicata is that when a court of competent jurisdiction has determined a litigated cause on its merits, the judgment entered, until reversed, is, forever and under all circumstances, final and conclusive as between the parties to the suit and their privies, in respect to every fact which might properly be considered in reaching a judicial determination of the controversy, and in respect to all points of law there adjudged, as those points relate directly to the cause of action in litigation and affect the fund or other subject-matter then before the court.": Wallace's Estate, 316 Pa. 148, p. 153.

In Reiter v. Reiter, 159 Pa. Superior Ct. 344, the doctrine was applied to facts somewhat analogous to those in the instant case. In the Reiter case, plaintiff, in 1933, had sued his wife for divorce in Philadelphia County, alleging, among other things, cruel and barbarous treatment on the part of his wife on July 12, 1931, as a ground for divorce. The master recommended the dismissal of the libel and found that the wife was not guilty of cruel and barbarous treatment on that occasion. In 1941, the husband again filed a libel in divorce, charging his wife in this action with wilful and malicious desertion. At the trial defendant wife offered in evidence the record of the prior Philadelphia case for the purposes of showing that the act of cruel and barbarous treatment alleged to have been committed on July 12, 1931, which was the act that plaintiff contended forced him to leave his home and thereby made his wife guilty of constructive desertion, had been adjudicated by the court in the Philadelphia case adversely to plaintiff. The trial court refused to admit the record. The Superior Court reversed, stating, p. 352:

"The court should have admitted the respondent's offer of the record in the Philadelphia divorce action, and should have sustained the plea of res judicata, not on the ground of identity of parties, cause of action, etc., but on the other ground, which is in effect an estoppel as between the parties in the first case to relitigate any question cognizable in that case."

Accordingly, it is urged that any matter which was finally determined by litigation in the wife's divorce proceeding in the McKean County proceeding, is barred from being relitigated in the present action, and that the present defendant's indignities constitute such matter. In our opinion this position is correct.

In the McKean County case, the wife's principal ground for divorce from bed and board was that her husband had maliciously turned her out of doors. It would have been a complete defense to that charge if the wife herself had been guilty of indignities to the person of her husband.

In the case of Grove's Appeal, 37 Pa. 443, (1861), it was held that in an action of divorce a mensa et thoro, brought by a wife against her husband on the grounds of turning her out of doors, the wife's misconduct in the nature of indignities to the person was not a justification, because (at that time) the divorce law of Pennsylvania did not recognize indignities to the person of a husband by a wife as a ground for divorce at the instance of the husband. The court said, p. 447:

"Nothing less will answer for a justification than that which would be a sufficient cause for a divorce at the suit of the husband."

Similarly, in the case of Gordon v. Gordon, 48 Pa. 226 (1864), a wife sued for a divorce from bed and board on the ground, inter alia, that her husband had turned her out of doors. The question was whether her conduct justified her act. The court charged the jury

that the cause which will justify a husband in turning his wife out of doors is such cause only as would entitle him to a divorce if he were seeking it, and that the conduct of the libellant did not exhibit such a cause. The Supreme Court affirmed, pointing out that while her conduct would amount to indignities to his person, that was not (then) a ground of divorce under the divorce acts of 1817 and 1854, then in effect.

The Act of June 28, 1923, P. L. 886, reënacted by the Act of May 2, 1929, P. L. 1237, sec. 10(b), provided that a husband as well as a wife may obtain a divorce on the grounds of indignities to the person. Therefore, the question whether defendant in this case, Anna L. Orr, had been guilty of indignities to the person at the time she alleged in her McKean County action that her husband had maliciously turned her out of doors, was necessarily involved in the decision of that case. If she had been guilty of indignities to the person sufficient to entitle her husband to get a divorce, he could not have been guilty of maliciously turning her out of doors, for his conduct in that respect would have been justified. It matters not that he failed to develop the facts which would have amounted to a defense to her action. It is sufficient that he contested the action and that the court found that he was guilty of having turned his wife out of doors without justification.

In the case of Crawford v. Crawford, 47 Pa. C. C. 56, the wife sued her husband for a divorce a mensa et thoro and obtained a decree. The husband subsequently brought an action for a divorce a vinculo matrimonii and it was held that his action was barred by the former decree in favor of the wife. At page 58 the court said:

"John W. Crawford had an opportunity, as above stated, to show what he now asserts, when the case in which his wife was libellant was pending, for, if true,

it would have been a defence, but he chose, for some unexplained reason, to then keep silence, and made no objection until after the entry of the decree against him in that case, when he, thereupon, presented a libel which substantially asks the court to make a decree between the same parties which would be the reverse of its former decree, by now holding that the wife's absence, during the same period of time, was without justification or excuse, and was, therefore, a desertion. Can it be done this way?"

The court held that it could not, stating, at page 63:

" 'The decree precludes the parties as to all matters which might have been legitimately proven in support of the charges or defenses in the action.' "

Counsel for plaintiff contends that the question of the wife's indignities, which is the basis of the present action, was not before the McKean County court. In our opinion, it was necessarily before the court, and whether defendant saw fit to offer evidence in support of that question or not, he is bound by the decree which was entered following the hearing and is precluded at this time from instituting an action for an absolute divorce founded upon the same facts which would have been a complete defense to her action for a divorce from bed and board.

While the reason already given would be sufficient to dispose of the present case, we have carefully considered the evidence offered by plaintiff before the master in support of his charge of indignities to the person on the part of his wife, and are of the opinion that that evidence does not establish a case of indignities on her part.

The acts of misconduct of which he contends she was guilty amount, in substance, to the following:

The wife frequently said that she did not like to live in Grove City because it was dry and she could not get a bottle of beer unless her husband brought it

home to her. However, he does not accuse her of drinking to excess or express any indication whether he objected to bringing it home to her, or whether he drank it with her.

In 1946, she went to her former home in Kane and remained four weeks, but she returned and they resumed living together. A little later she told the wife of the head of the hospital that while she was gone her husband had had several wild parties with some of the students at the internes' quarters, which he says is not true. This was not said, however, for the purpose of hurting him in his employment, but in order to obtain rental quarters which the Bashlines owned, and the information as to this incident was given by defendant to plaintiff as explaining why she was able to get the apartment for them. The wife demanded that they move to better apartments and they moved several times. Plaintiff admitted that the moves were advantageous.

The wife complained about plaintiff being away from home and spending too much time at his work and accused him of wasting his time fooling with nurses, all of which he said was not true.

When plaintiff tried to correct their son his wife would tell him to leave the boy alone, that he had "no damn business correcting him", and on one occasion she said that the boy was not supposed to pick up his toys until he was at least five years old. Plaintiff said that because these arguments over the correcting of the child occurred so frequently he spent a great deal of time "over street."

In July of 1952, plaintiff had an offer of a job at another hospital in Grove City which would pay him more money and his wife wanted him to take it. When the Bashline Hospital matched the offer of the other hospital and he decided to stay, his wife said, "God damn you, if you do, after agreeing to go up to the

city hospital and my telling people that you were going up there, you can just go to hell as far as I am concerned." However, he took the Bashline Hospital offer and apparently nothing more came of that incident.

Plaintiff was subject to certain calls at his home which might require him to return to the hospital for work after he had gone home. When he and his wife were living out in the country, plaintiff was at a neighbor's home, 100 yards from his home. The hospital called plaintiff's home and his wife said that he was not there. When plaintiff asked her about this she said, "As far as I am concerned I don't give a damn whether they find you or not. If you are here when the phone rings, if you answer, all right, if you aren't, I don't care." On one occasion, on a Saturday afternoon, plaintiff was watching a football game on the television set. His wife swore and said, "There's no use in your being home Saturday afternoon because you only watch a damn football game." Then she began to sew on an electric sewing machine, and when he complained about it spoiling his picture on the television she said it was the only time she had to do it and said further, "Why don't you go to the Legion and watch it? There's where you used to watch it."

She threatened to set his clothes outside because she said he spent more time in town that he did at home. She said that between the hospital and the poolroom he spent more time than he spent at home and he might as well go in town and stay there.

Plaintiff said that he ironed "plenty of my own shirts; I did washing too." He said that he brought groceries home and that he and his wife had frequent arguments over his failure to bring groceries, at which times she would call him "a dirty rotten bastard", "a son of a bitch" and "everything else." There was no evidence, however, that these names were ever called in the presence of other persons.

They took their child up to the Mercer Moose Club frequently because they could not get a baby sitter, and when plaintiff there attempted to control the little boy his wife told him to "shut up and mind his own business, that the boy was all right where he was."

On several occasions she said that it was "too damn bad that plaintiff didn't break his neck instead of his back" in an accident sustained while he was in the army.

On one occasion plaintiff forgot to bring home some dog food and his wife called him a "no good bastard", that he couldn't remember anything and wasn't good for anything else, because he forgot the dog food.

In July of 1953, he moved his wife up to Kane. In December of that year his wife returned and stayed at a neighbor's. She called plaintiff because of their boy being sick and he went to see him. In February of 1954, she returned to Kane. In March, when he went to Kane to see his wife and boy, he learned that the boy was in a home in Erie. While his wife was in Grove City in December of 1953 or January of 1954, she told him that she was going to run him out of Grove City if he didn't take care of the boy and her and was going to see several prominent people for that purpose. There is no evidence, however, that she ever embarrassed him before these citizens by carrying out this threat.

He said that he saw a letter that she had written to a friend in which she stated that plaintiff had threatened to kill her if she ever came back to Grove City to live. However, she did come back after that and nothing happened.

Plaintiff called several corroborating witnesses. One was Mrs. Dorothea Palmer, who said that defendant had told the witness that they had not had a nice Christmas in 1953 because Mr. Orr wouldn't come to see the boy. Another, a janitor at one of the apart-

ments, said that defendant was not a good housekeeper and that things were very dirty at the apartment. The supervisor of nurses testified that on occasion she called the Orr residence to have plaintiff report for work when off duty, that sometimes defendant was congenial and sometimes she was not and that defendant said that she did not like it in Grove City and didn't like the work which her husband did. A neighbor, Mildred Humphrey, testified that defendant said that she did not like Grove City and was not happy there, and that she thought her husband might do better in some other place, because he did not make much money and there were extra hours to work, and that she objected to this and thought that he should have spent the time at home in the evening. This witness said she remembered hearing Mrs. Orr swear while listening through the partition. She also said that defendant was rather untidy as a housekeeper, and that she had seen plaintiff doing some ironing. She stated that defendant objected when plaintiff reprimanded their child.

Mrs. Leona Bishop, a neighbor, testified that defendant and the witness's husband used to call Grove City, in fun, "an old dried-up town, that you couldn't get a bottle of beer if you wanted to, and that they knew where you could get it if you wanted to." The witness said, however, that that was more or less in fun than really condemning the town. She stated that the Orrs would quarrel one day and the next day they would be sweethearts and friends, and that this situation continued over a period of about 10 years. She said that she had seen plaintiff wash his own shirts and that Mrs. Orr did not correct their boy properly. She admitted, however, that defendant was not very well on one of these occasions and did not seem to care very much what the boy did.

Mrs. Grace Jaillet, a nurse, testified that on one

occasion she talked with defendant and that defendant said she did not like Grove City and would like to be away from there.

Defendant's version of the alleged indignities was different from that of her husband. According to her testimony, it was plaintiff who wanted her to go to Kane for a year because he was in debt and was worrying about it, and she did not want to go. She said that he insisted that they put their place up for sale and that she finally agreed to it, that she went to Kane for a couple of weeks to help her mother and that plaintiff came up and helped her to find a home and gave her money to rent one, that she returned to Grove City and found that her husband had sold all of their furniture except a little bit, and that she took what was left and her husband and her brother helped her move to Kane with the agreement that plaintiff would come up when he could, that he came up every other weekend, or at times during the week, and they agreed that $150 would be what her expenses were, that they were getting along fine and that she was planning on them going on a vacation in September, but that when he came up the last of August, 1953, after staying all night with her as husband and wife, he stated in the morning that he wanted a divorce, that she sat down and cried and practicaly begged him to take her and the boy back to Grove City if it was going to break up their home. She stated that he said definitely that he didn't want them down there and asked about separation papers and that she replied that she was still living with him and had no intention of leaving him, and that when he brought separation papers up she would have nothing to do with them. She said that on her husband's visits he lived with her as man and wife. Plaintiff did not contradict this testimony. Defendant testified that ill health was a factor in her leaving Grove City for Kane. She described her health condi-

tion as consisting of coughing spells which required her to sit up all night, and which were due to a nervous condition caused by a hyperthyroid. She stated that it was her husband's idea that possibly a year in Kane might put her back on her feet and that was why she went to Kane. When asked if she had any particular dislike for Grove City she replied that she was fighting for the right to get back to Grove City and still wants to live with her husband and maintain their family there. As to the alleged threat to go to Florida or Arizona, she stated that she had merely made the remark that she would like to go to Arizona since everybody was talking about going to such places, but that when she discussed it with her husband she later forgot about it and that was the end of it. As to her earlier acts of leaving Grove City, she stated that she had done this only after she came home from the hospital, when she was recuperating from a serious operation, at which time she went home for a couple of weeks.

As we review the testimony, it appears to us that many of plaintiff's charges are trivial. The quarrel about the use of the television, the name calling when he forgot to bring home dog food, the bickering about the control of their child and the repeated reference to the wife's dislike of Grove City as a place to live, all suggest the presence of minor misunderstandings that are characteristic of many immature married couples rather than serious acts of misconduct on the part of the wife that would warrant the severance of the marriage tie. A more appropriate appraisal of the true nature of these incidents, we think, is that of the witness, Leona Bishop, who said that the parties would quarrel one day and the next day they would be sweethearts and friends, and that this went on for 10 years.

Indignities to the person, as a ground of divorce, consist of serious and long continued acts of misconduct, such as vulgarity, unmerited reproach, habitual

contumely, studied neglect, intentionable incivility, manifest disdain, abusive language, malignant ridicule and every other plain manifestation of settled hate and estrangement: McKrell v. McKrell, 352 Pa. 173 (1945).

Slight or irregular acts of misconduct are not sufficient to amount to indignities to the person: Evans v. Evans, 152 Pa. Superior Ct. 257 (1943).

In considering whether divorce should be granted upon grounds of indignities, the law does not concern itself with isolated occurrences but contemplates a course of conduct or continued treatment, not single acts separated by long intervals of time, and there must be evidence from which inferences of settled hate and estrangement may be deduced: Friess v. Friess, 156 Pa. Superior Ct. 38.

Slight or irregular acts of misconduct do not constitute indignities rendering the condition of the injured party intolerable: Koontz v. Koontz, 97 Pa. Superior Ct. 70, (1929).

Irritating acts of nagging, petty quarrels and lack of affection are not considered indignities entitling the other spouse to divorce: Blose v. Blose, 163 Pa. Superior Ct. 322, (1948).

Domestic disputes are not cause for divorce unless they have the magnitude and importance of actual personal violence, or the reasonable apprehension of it, or such indignities to the person as render one's condition intolerable: Katz v. Katz, 102 Pa. Superior Ct. 551, (1931).

Proof that a husband customarily and persistently so conducts himself as to demonstrate that love and affection are replaced by settled hate and estrangement, and that such conduct makes the wife's life intolerable and burdensome, is required to establish indignities as grounds for divorce: Knaus v. Knaus, 173

Pa. Superior Ct. 111, (1953). The same would be true of a wife's conduct towards her husband.

The untidy housekeeping and the indifference to the child's behavior could well be accounted for, at least in part, by the condition of the wife's health. Mildred Humphrey, called by plaintiff, stated that she knew that Mrs. Orr had had pneumonia and a kidney condition, and that she had heard her say that she did not feel well at various times. Mrs. Leona Bishop also said that defendant was not very well and intimated that this was the reason why she did not seem to care what the child did. Plaintiff himself testified that after their child was born his wife was "not too well; for some reason or other—whether she got dizzy or not, she fell down the steps a couple of times." Her health condition would be a logical explanation for plaintiff ironing his own shirts, which is a commendable act on his part, but which he asks us to regard as an indignity to his person on the part of his wife.

The law does not recognize unusual conduct resulting from illness as a ground for divorce, and the acts of a spouse resulting from ill health are not grounds for divorce: Albrecht v. Albrecht, 176 Pa. Superior Ct. 626.

In a husband's suit for divorce on the grounds of cruel and barbarous treatment and indignities by the wife, the wife was excused from the alleged indignities to the extent that her conduct was involuntary and was induced by her physical condition: Duchossios v. Duchossios, 139 Pa. Superior Ct. 1 (1940).

On the other hand, when Mrs. Orr was able to work she did so. Even plaintiff admitted that the two of them together did the labor work necessary to erect their home on the Grove City road, starting with a garage.

The most serious charge of misconduct contained in this record, viz., leaving her husband and moving to

Kane, was, without question, previously adjudicated adversely to plaintiff, in the McKean County divorce from bed and board. The sole ground upon which that divorce was granted was the malicious turning of the wife out of doors by the husband. He cannot relitigate that incident in the present suit, hence his version of it must be rejected.

Further, it must be remembered that plaintiff's credibility is seriously impeached as a witness by his false averment of residence in his complaint in the Nevada divorce. In that complaint he made oath that he was a bona fide resident of Nevada at a time when, as he testified under oath in the present case, he was a bona fide resident of Pennsylvania. Accordingly, at the points where the testimony of the parties conflicts, that of the wife, which is unimpeached, is the more entitled to be credited.

If, contrary to our holding on the second issue, it were the law that the McKean County decree is not res judicata as to the wife's indignities, the record of that case would then, at least, be admissible in evidence against the husband with the same effect as a non-support order under the Act of 1867, under the ruling in Loughrey v. Loughrey, supra, and it would require a strong case on the part of the husband to overcome it.

We do not regard the husband's case on this record as a strong one. On the contrary, it completely fails to measure up to the standard required by the decisions to establish indignities to the person.

Defendant contends that plaintiff is not entitled to a decree for the additional reason that the evidence does not show him to be the innocent and injured spouse, due to the finding in the McKean County divorce from bed and board. In our opinion, that divorce decree is material in the present case under the rule of res judicata as to the wife's indignities, rather than as indicating that the husband is not the innocent and

injured spouse. The requirement of the Divorce Law that plaintiff be the innocent and injured spouse relates to the particular ground of divorce in issue here, indignities to the person: Reichl v. Reichl, 37 D. & C. 477, (1940). The McKean County divorce settles nothing as to the husband having committed indignities to the person of his wife, for that ground of divorce was abandoned and not litigated in the earlier case.

### Order

Now, March 16, 1956, exceptions nos. 5, 6, 7, 8 and 9-C to the master's report are sustained, and plaintiff's complaint is dismissed.

### Exception

Now, March 16, 1956, counsel for plaintiff excepts to the foregoing order of the court, and, eo die, a bill of exceptions is sealed for plaintiff.